**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **The Kraft Heinz Company Employee Benefits Administration Board,  Kraft Heinz Company Group Benefits Plan, and Kraft Heinz Company Retiree Group Benefits Plan,**<br><br>    **Plaintiffs,**<br><br> **vs.**<br><br>**Aetna Life Insurance Company,**<br><br>    **Defendant.** | **Civil Action No.  _____** |

**COMPLAINT**

Plaintiffs The Kraft Heinz Company Employee Benefits Administration Board, the Kraft Heinz Company Group Benefits Plan, and the Kraft Heinz Company Retiree Group Benefits Plan (collectively, "Kraft Heinz" or "Plaintiffs") through their undersigned counsel, submit this complaint against Aetna Life Insurance Company ("Defendant" or "Aetna"), and allege as follows:

**PRELIMINARY STATEMENT**

1.      Kraft Heinz hired Aetna to administer the medical and dental plans for Kraft Heinz employees, retirees, and their family members ("Plan Participants").  Aetna leveraged its role as the third party administrator or "TPA" to enrich itself to Kraft Heinz's detriment.  Aetna breached its fiduciary duties and engaged in prohibited transactions.  Kraft Heinz brings this complaint to seek equitable relief for those wrongs.

2.      Aetna serves as the intermediary between Kraft Heinz and the health care providers who treat and care for Plan Participants.  In exchange for a monthly fee, Aetna provides access to its network of providers and adjudicates claims for payment submitted by those providers.  In other words, Aetna decides which claims should be paid and how much to pay.

3.      Since the beginning of 2012, Aetna has taken more than $1 billion from Kraft Heinz to pay providers for medical services provided to Plan Participants.  Included in that more than $1 billion, Aetna (a) paid millions of dollars in provider claims that never should have been paid, (b) wrongfully retained millions of dollars in undisclosed fees, and (c) engaged in claims-processing related misconduct to the detriment of Kraft Heinz.

4.      Aetna is a fiduciary under the Employee Retirement Insurance Security Act ("ERISA").  Aetna owes ERISA-imposed fiduciary duties to Kraft Heinz.  Its conduct breached those duties.  Aetna has engaged in fraud or concealment to prevent and interfere with Kraft Heinz's efforts to investigate and understand Aetna's conduct.

5.      Kraft Heinz brings this action to address the harm Aetna's wrongful conduct caused and to enjoin Aetna from continuing to engage in any further wrongful conduct. [1]

**PARTIES**

6.      The Kraft Heinz Company Group Benefits Plan and the Kraft Heinz Company Retiree Group Benefits Plan ("Plans") are health and welfare benefit plans organized and operated

---

[1]      On December 31, 2021, Kraft Heinz initiated an arbitration captioned *The Kraft Heinz Company Employee Benefits and Administration Board, Kraft Heinz Company Group Benefits Plan, and Kraft Heinz Company Retiree Group Benefits Plan v. Aetna Life Insurance Company* asserting the ERISA claims and equitable relief sought herein.  Aetna has taken the position that these ERISA claims and the equitable relief sought are outside the scope of the applicable arbitration provision.  This complaint follows.

1

under ERISA.  In 2015, Kraft Foods Group, Inc. merged with and into Kraft Heinz Foods Company (formerly known as H.J. Heinz Company) to form The Kraft Heinz Company.  In connection with that merger, the Kraft Heinz Company Group Benefits Plan and the Kraft Heinz Company Retiree Group Benefits Plans succeeded to the health and welfare benefit plans for employees and retirees that Kraft Foods Group, Inc. and H.J. Heinz Company had each sponsored.

7.      After the merger, The Kraft Heinz Company established The Kraft Heinz Company Employee Benefits Administration Board ("EBAB") to act as administrator and fiduciary of the Plans.  EBAB succeeded to the administrative and fiduciary responsibilities for the prior entities' plans.

8.      The Kraft Heinz Company is a Delaware corporation co-headquartered in Chicago, Illinois and Pittsburgh, Pennsylvania.

9.      Defendant Aetna Life Insurance Company is a Connecticut corporation with its principal place of business in Hartford, Connecticut.

**JURISDICTION AND VENUE**

10.     Pursuant to 29 U.S.C. § 1132(e) and 28 U.S.C. § 1331, this Court has jurisdiction over the claims asserted in this Complaint.

11.     The Court has personal jurisdiction over Aetna because, at all times relevant to the claims asserted herein, Aetna conducted business in the State of Texas within the meaning of the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code § 17.  Aetna's contacts with the State include, but are not limited to:

a.      In 1909, Aetna registered with the Texas Department of Insurance to operate in Texas (including this District).  The Texas Department of Insurance licensed Aetna to offer health insurance products in the State (and

2

accident and life insurance and variable annuities).   Aetna has license number 400.   Since receiving its license in 1909, Aetna has operated continuously in the State of Texas.

b.     As of 2021, the Texas Department of Insurance reported that Aetna was the 6th largest insurer in the State with a market share of 4.90% and reported premium intake of $2,496,755,048. *See* <u>Top 40 List of Insurers in Texas</u>. Neither the market share nor premium revenue include the market share or premiums of other companies that may be affiliated with Aetna.

c.     Aetna has multiple offices in this State and within the District;

d.     Aetna has contractual relationships with hundreds, if not thousands, of doctors, hospitals, and other healthcare providers that care for and treat patients in the State and in this District, ranging in size from large hospital systems to single doctor practices (generally, those who render health care will be referred to as "providers");

e.     Aetna provides medical and dental insurance coverage to thousands of families and individuals who reside in this State and in this District;

f.     Aetna has contractual relationships with hundreds of employers and plan sponsors that are based in, operating in, have employees working in, or have employees residing in this State and in this District; and

g.     Aetna provides and has provided medical and dental coverage to Kraft Heinz employees and their families in this State and in this District.

12.     By agreeing to contract, adjudicate, and to transmit payment for medical treatment and dental care of Kraft Heinz employees, retirees, and beneficiaries residing in Texas, and for

3

medical and dental services rendered in the State, Aetna has purposefully availed itself of the privilege of conducting business within Texas.

13.    Aetna has previously filed complaints and prosecuted claims in this District.  Aetna has previously been sued in this District and did not object to jurisdiction or venue.

14.    For the reasons stated above, venue is also proper in this District pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b)(2).

## BACKGROUND

### A.    Kraft Heinz Hired Aetna to Provide Third Party Administrator Services

15.    Aetna has served as a TPA for the Plans dating back to at least 2007.  The Plans lack the expertise to evaluate claims for payment submitted by doctors and hospitals—a process called claims adjudication.  Kraft Heinz delegated that responsibility to Aetna.  Aetna was selected as one of the Plans' TPAs and fiduciaries because Aetna represented its expertise evaluating payment claims submitted by providers for adherence to the Plans' coverage and reimbursement policies and industry-standard coding guidelines dictated by the Centers for Medicare and Medicaid Services ("CMS") and the American Medical Association ("AMA").

16.    As a TPA, Aetna does not provide traditional medical insurance to Kraft Heinz employees or retirees.  Aetna does not pay medical expenses for participants of the Plans in exchange for premiums.  Rather, Kraft Heinz retain the financial risk of increased medical expenses among their beneficiaries and participants by funding the medical expenses incurred by the Plans' beneficiaries using funds allocated from The Kraft Heinz Company for that purpose.  In other words, Kraft Heinz self-funds its employees' and retirees' medical expenses (with contributions from some employees and retirees in certain circumstances).

17.    In 2011, Kraft Foods Group, Inc. ("Kraft Foods") and Aetna entered into an Administrative Services Agreement ("2011 Agreement") wherein Aetna agreed to provide claims

adjudication services to Kraft Foods, including the "Funding and Payment of Claims," "Benefit Determinations," and "Claims Administration."   2011 Agreement at 7–10.   Aetna agreed to "provide, control and manage" the "initial claims administration," including, but not limited to "disbursing or providing, to the person entitled thereto, payments or authorization for services that Aetna determines to be due as a Benefit."  *Id.* at 12.

18.     The January 1, 2015 Master Services Agreement No. MSA-868707 ("2015 Agreement") identifies Aetna as a fiduciary:

> Aetna . . . will discharge their obligations under the Services Agreement with that level of reasonable care which a similarly situated Services provider or Plan Administrator under ERISA, as applicable, would exercise under similar circumstances. In connection with fiduciary powers and duties hereunder, as delegated by Customer to Aetna and as noted in the Claim Fiduciary section of the applicable SAS, *Aetna shall observe the standard of care and diligence required of a fiduciary under ERISA Section 404(a)(1)(B).*

2015 Agreement at 2 (emphasis added).

19.     Aetna's decision-making authority under the 2011 and 2015 Agreements went far beyond mere application and compliance with its own guidelines.   Because Aetna exercises discretionary authority and control respecting management of the Plans and the disposition of the Plans' assets, in addition to being a named ERISA fiduciary, Aetna is also a functional fiduciary under ERISA.

20.     As a fiduciary, Aetna agreed to provide "Member and Claim Services" for the Plans.  Specifically, and by way of example, Aetna agreed to "process and pay the claims for Plan benefits . . . using Aetna's normal claim determination, payment, and audit procedures and applicable cost control standards in a manner consistent with the terms of the Plan and the Services Agreement."  2015 Agreement at 16.

21.     As a fiduciary, Aetna agreed to be responsible for processing and reviewing claims for health benefits by Plan Participants, including: (i) the eligibility of each claimant under the

5

terms of the Plans, and (ii) the eligibility of the claim for health benefits under the terms of the Plans.

22.     As a fiduciary, Aetna agreed to be responsible for the approval and payment of only those claims that are legitimate, *i.e.*, not those that are fraudulent or otherwise improper and otherwise fail to satisfy the requirements of the Plans.  All other claims for payment must be denied.  As the 2015 Agreement provides:

> When a claim is submitted for services incurred after the Effective Date, covered by the Plan, and performed by a Network Provider, Aetna will issue a payment on behalf of Customer for those services in an amount determined in accordance with the Aetna contract with the Network Provider and the Plan benefits.  In addition to standard fee-for services rates, these contracted rates with network providers may also be based on case rates, per diems and in some circumstances, include risk-adjustment mechanisms, quality incentives, pay-for-performance and other incentive adjustment mechanisms….

2015 Agreement at 16.

23.     Kraft Heinz has no role in Aetna's decision to approve or deny claims.  Kraft Heinz also has no role in Aetna's decision to pay any particular amounts for approved claims.  Aetna is uniquely positioned to make and exercise discretionary authority or control over plan management, including the right to change unilaterally the value of a fee or rate.  Aetna is further provided broad flexibility in determining its course of action in administering the plans.  Kraft Heinz relies on Aetna to process, review and adjudicate claims for health benefits properly.  Aetna is only supposed to pull from the Plans that amount of money actually paid to providers.

24.     Between 2012 and the present, Aetna pulled over $1 billion from Kraft Heinz to pay medical claims:

|      |              |
|------|--------------|
| 2012 | $356,871,910 |
| 2013 | $253,009,066 |
| 2014 | $249,402,704 |

| | |
|---|---|
| 2015 | $225,997,473 |
| 2016 | *$39,808,588* |
| 2017 | *$52,597,275* |
| 2018 | *$41,394,549* |
| 2019 | *$47,121,154* |
| 2020 | *$42,838,031* |
| 2021 | *$43,658,916* |
| Total: | $1,352,699,666 |

25.     Various courts have found Aetna to be an ERISA fiduciary when acting as a third-party claims administrator in a role comparable to that it serves for Kraft Heinz.  Aetna has also represented to judicial officers in other proceedings that, when acting as a third-party claims administrator, Aetna is an ERISA fiduciary.  *See, e.g.*, *Aetna Life Ins. Co. v. Bayona*, 223 F.3d 1030, 1033 (9th Cir. 2000) ("We agree with Aetna that the company qualifies as a fiduciary for purposes of the statute.  When an insurance company administers claims for an employee welfare benefit plan and has authority to grant or deny the claims, the company is an ERISA 'fiduciary' under 29 U.S.C. § 1002(21)(A)(iii).").

26.     Aetna owes fiduciary duties to Kraft Heinz.

**B.     Aetna Has a Fiduciary Duty to Identify, Deny, and Prevent the Payment of Fraudulent and Otherwise Improper Claims**

27.     Aetna has a fiduciary duty to exercise "care, skill, prudence and diligence" to identify, deny, and prevent the payment of false, fraudulent, or improper provider-submitted claims or other claims that do not satisfy the eligibility and other requirements of the Plans.

28.     As an ERISA fiduciary, Aetna must "process and pay the claims for Plan benefits . . . using Aetna's normal claim determination, payment and audit procedures and

applicable cost control standards."  2015 Agreement at 16; *see also* 2011 Agreement at 11-12 ("receiv[e] each claim for a Benefit, and timely review[ ] such claim to determine what amount, if any, is due, payable and/or allowable with respect thereto as a Benefit . . . [and] disburs[e] or provid[e], to the person entitled thereto, payment or authorization for services or supplies that Aetna determines to be due as a Benefit.").  This requires Aetna to employ efforts to combat fraud, waste and abuse that are at least as stringent as its efforts with its own, fully insured, insurance plans.

29.     Aetna also must pursue recovery of all "overpayments of Plan benefits." *See also* 2011 Agreement at 9-10 ("In the event Aetna causes the Trust I or Kraft . . . to overpay any person with an amount in excess of the Benefit . . . Aetna shall undertake good faith efforts to recover an Overpayment.").  In other words, if Aetna pays fraudulent or illegitimate claims, then it has an affirmative obligation to seek recovery of those payments.  As a fiduciary, Aetna is prohibited from siphoning funds, *i.e.,* undisclosed fees, from the Plans under the false pretenses that it is paying claims while extracting undisclosed fees from the funds intended to pay medical services.

30.     Aetna has breached its fiduciary duties by approving and paying false, fraudulent, and improper claims and by withdrawing undisclosed fees from the funds Aetna extracts from the Plans to pay those providers that cared for and treated Plan Participants.

31.     Notwithstanding its fiduciary obligations to "aggressively investigat[e] all types of fraud using the latest detection, investigation, and recovery techniques," Aetna approved, and using Plan assets, paid millions of dollars of claims that never should have been paid.  In most instances, the wrongfully paid claims were paid automatically and almost immediately with no human review.

## AETNA'S WRONGFUL CONDUCT

**A.      Aetna Refuses to Give Kraft Heinz Its Own Medical Claims Data**

**1.      Administrative Simplification and Standard Transaction Basics**

32.     Federal regulations require that participants in the health care system, *e.g.*, providers, health plans, and insurers, exchange information regarding enrollment, eligibility, billing, claim status, adjustments, adjudication, and payment using specifically defined electronic data sets.  Claim processing and payment is governed by the Health Insurance Portability and Accountability Act ("HIPAA") Administrative Simplification regulations.  *See* 45 C.F.R. § 162.920(a).  HIPAA requires "covered entities" to comply with all HIPAA transaction standards, operating rules, and code sets.  *See* 45 C.F.R. §§ 160.103, 162.100.  Aetna is a "covered entity" as that term is defined in Title 45 of the Code of Federal Regulations.  These regulations require that the electronic data sets be used to send and receive the medical claims data in the X12 5010 standard.  The Department of Health and Human Services has adopted EDI data set standards by regulation.

33.     As a covered entity, Aetna must comply with the HIPAA regulations.  Aetna also represented to Kraft Heinz that it would comply with all HIPAA standards, including those governing the use of the EDI and the X12 5010 standards.  *See* 2015 Agreement § 19 ("Health Insurance Portability and Accountability Act (HIPAA) Compliance").

34.     Consistent with the applicable regulations, Aetna employed the X12 5010 standard transaction data sets when it processed Kraft Heinz's employees' medical claims.

35.     In addition to payers, *i.e.*, self-funded health plans and health insurance companies, and providers, "EDI clearinghouses" play a critical role in enabling the electronic transmission of medical claims.  *See United States v UnitedHealth Group Inc.*, No. 1:22-cv-0481 (CJN), 2022 US Dist. LEXIS 170934, at *9 (D.D.C. Sep. 19, 2022).  In 2021, 97 percent of medical claims were

submitted electronically and 95 percent of providers and 99 percent of insurers used EDI clearinghouses to process those transactions.  *Id*. at *7.  A substantial amount of medical claims data flows through EDI clearinghouses—covering the entire lifecycle of a claim—both pre- and post-adjudication.  *Id*. at *8.  Pre-adjudicated claims data include details about the provider, the patient, the employer group, the location of care, the diagnosis, the services/procedures rendered, and the billed amounts; post-adjudicated claims data often includes even more information, such as details about the provider-payer contract, the payer's claims edits, the medical policy and benefit design, the final paid amount, and adjudication decisions.  *Id*. at *8-9.

36.    In practice, the medical claim submission and claim process works as follows. After a provider treats a patient, a treatment record is created and a standard billing form—CMS-1500 Health Insurance Claim Form—or "HCFA" is prepared.  This is essentially a bill, invoice, or claim, prepared by the providers and submitted to Aetna.  In parallel and increasingly more common, the information in the HCFA form is translated into a specific, regulation-required ANSI X12 5010 format EDI data, the 837.  As is customary in the industry, Plaintiffs transmit the EDI bill electronically to Aetna.

37.    Aetna publishes Companion Guides that provide instructions for electronic communications and supplemental information for creating transactions while ensuring compliance with ASC X12 instructions.

38.    Once the HCFA or 837 is transmitted to the insurance company, the insurance company must acknowledge receipt within two days.

39.    If Aetna accepts and processes the transaction (claim(s) and incurred charges), then it generates a document known as an "Electronic Remittance Advice" or an "835," which is a record of claims adjudication or adjustment and payment for the submitted claim.  An 835 is not a

rejection of the claim.  The 835 is then required to be transmitted to the provider's office and maintained by Aetna in the standard or original format for auditability.

40.     If Aetna rejects a claim, then it does not generate an 835.  Rather, it generates an EDI data record referred to as a "999" and transmits that to the provider's office.  A rejected claim also triggers the creation of a CCD+ Addenda in the amount of $0.00.

41.     When a provider bills Aetna for services or treatment, they follow the industry standard service and treatment codes, including Current Procedural Terminology ("CPT") codes, Diagnostic-Related grouping ("DRG") codes, and International Classification of Diseases ("ICD") codes.

## 2.     Aetna Claims It is "Not Familiar" with HIPAA-Required Standard Transaction Medical Data Sets

42.     Aetna has all of the medical claims data associated with processing, adjudication, and payment of claims associated with the care and treatment of Kraft Heinz employees, retirees, and their family members.  The regulations require Kraft Heinz to maintain medical claims data relating to claims adjudicated and paid under the Plans.

43.     The medical claims data Kraft Heinz seeks *belongs to Kraft Heinz*.  Aetna merely has the "right to use" that information.  2015 Agreement § 10.  This makes sense because, as TPA, Aetna is "an agent with respect to claim payments."  *Id.* § 20(A).

44.     Paragraph 10 of the 2015 Agreement requires that "Plan-related benefit information contained in the Documentation shall be made available to Customer or to a third-party designated by Customer."  2015 Agreement at 7.  Without this data, Kraft Heinz is unable to assess Aetna's handling of the Plans' funds and associated payment integrity.  Kraft Heinz owns this data and has an absolute right to it.

45.     On November 11, 2021, Kraft Heinz made a formal request of Aetna for the medical claims data.  Kraft Heinz requested the medical claims data in the format Aetna is required to maintain it consistent with the Affordable Care Act and the associated Administrative Simplification Rules.

46.     On November 30, 2021, an Aetna representative responded that Aetna was "not familiar with the items requested."  In other words, Aetna responded that it was "not familiar" with the HIPAA-required standard transaction data sets that form the backbone of Aetna's medical insurance business.  After Kraft Heinz made a follow up request, Aetna did not respond.

### 3.     Over One Year Later, Aetna Gave Kraft Heinz Medical Claims Data That Aetna Edited and Self-Selected

47.     In late 2022, Aetna provided Kraft Heinz with some self-selected and edited medical claims data for 2016 through part of 2022 (with one gap).  Although incomplete, on its face Aetna's incomplete and self-selected data proves Aetna breached its fiduciary duties to Kraft Heinz.

48.     Aetna provided its "Universal" Medical/Dental File."  Aetna refused to provide pre-2016 medical claims data.  Aetna has this pre-2016 medical claims data in its possession, custody, and control.

49.      Aetna's use of "Universal" to describe the file is a misnomer—actually a contradiction.  Aetna intentionally and artificially limited this file to be a "tab-delimited, fixed-length, text without a header record" with 178 Aetna-cherry-picked data fields limited to fit within a 1480 character data-string.  Aetna did not provide the complete HIPAA-mandated standard transaction data.  The data fields described in the dictionary bear little resemblance to the information Aetna must maintain in its data repository.  Well over half of those fields contain duplicate information, are not populated or provide only filler, are related to dental claims, or are

unrelated to the medical claims.  The remittance advice alone, which Aetna, like all health insurance companies, necessarily generates and sends to the clearinghouses and to the doctors for each claim it processes, has over 400 data fields.

50.     Aetna's data dictionary qualifies that Aetna "cannot guarantee the accuracy or completeness" of the "information in an electronic field described by [the] data dictionary."  The data dictionary refers to Aetna's "Data Warehouse" as well as various other types of reports containing more claims-related data than the fields in the "universal" file.  Neither the data dictionary nor the associated data include a host of fees associated with the claims, nor does it include claims-specific reprocessing, adjustments, reversals, or recovery recognition.

51.     Aetna's data dictionary reads that the data "does NOT contain paid/recorded data from our financial/banking systems; therefor it does not include issued or recorded dates or amounts."  This unbridged disconnect was one reason Kraft Heinz's sought 835s because they are supposed to reflect the actual amounts paid to the providers.  Aetna generates millions of 835s and transmits them to clearinghouses and to providers.  Aetna touts providing "HIPAA-compliant Electronic Remittance Advice" or "ERAs" to contracted providers on its website.  ERA provides claim payment explanations in HIPAA-compliant files."  Those are ANSI X12 835s. *See* 45 C.F.R. § 162 (2009).

52.     Aetna's artificially limited data set excluded more than 110 data fields that Kraft Heinz specifically identified and more than 200 data fields included in the 835 transaction sets. The 835 is particularly relevant because Aetna generates and transmits all of the data in the X12 835 data set.  The 835 is the data record sent to providers to explain the payment for the associated service(s) provided and any adjustments.  The 835 serves the same function as a pay stub delivered

from an employer to an employee; it informs the employee how much money he or she can expect to find in the appropriate bank account and how that number was calculated.

53.     Focusing just on the 835 data set, Kraft Heinz does not have:

- *Reassociation trace number (or "RTN").*  The reassociation trace number is used in both EDI X12 5010 transactions and ACH financial transactions.  It can be used to associate the medical claim with the corresponding ACH deposit.

- *Accurate information regarding actual payments to providers.*

- *Claim adjustment reason codes.*  The regulations require Aetna to use specifically defined Claim Adjustment Reason Codes when identifying the basis for adjustments to the provider-billed amount to arrive at the actual paid amount in the 835 remittance advice.  *See* 45 C.F.R. § 162.920(c)(4)(iv).  They need to begin with "CO," "OA," "CR," "PA," or "PR."  *See* Claim Adjustment Reason Codes | X12.

- *Servicing provider information.*  Frequently, the "billing" provider is not the "servicing" provider.  For example, a hospital may be the "billing" provider, but a surgeon or a physical therapist may be the "servicing" provider.

- *Patient address.*

- *Prior authorization number and type.*

- *Coverage beginning and termination dates.*

- *Admitting diagnosis code.*

54.     All such information is in Aetna's possession, custody, and control and readily accessible to Aetna as TPA for the Kraft Heinz plans.  If it is not, then Aetna is not in compliance with its regulatory obligations.  Aetna's failure to give Kraft Heinz its own standard transaction information violates Aetna's fiduciary duties.

**B.      The Incomplete Medical Claims Data Proves Aetna Breached and Continues to Breach Its Fiduciary Duties**

55.      Even though incomplete, the medical claims data proves Aetna failed to do the job for which Kraft Heinz paid it, to Kraft Heinz's detriment and in violation of Aetna's fiduciary duties.  Kraft Heinz pays Aetna to prevent payment of duplicate claims.  Yet, Aetna has taken millions from Kraft Heinz to pay thousands of duplicate claims since 2016.

56.      As discussed above, procedure and treatment codes are used on claim submissions to identify the care, service, or treatment provided.  If a procedure or treatment code is missing or incorrect (meaning undefined), then the claim should not be paid.  In other words, the basic information regarding the service provided—whether for wrist surgery or childbirth or routine physical or chemotherapy treatment—was missing from the medical claims data.  Aetna approved thousands or claims worth millions with missing or incorrect medical procedure codes.  Aetna approved these claims almost immediately with no follow-up, inquiry, much less time to request receive, medical records that would permit Aetna to review and assess the validity of the claim or to identify the service actually provided.

57.      The Agreements permit Aetna to use subcontractors or other contracted parties to provide the required services.  The Agreements, however, do not permit Aetna to bill Kraft Heinz for additional or incremental fees associated with the services provided by those subcontractors or other contracted parties.  2015 Agreement at 2.  The 2011 Agreement likewise did not permit Aetna to adjust administrative fees to add additional or incremental services for subcontractors. 2011 Agreement at 26, 29.  Aetna has, in the past, been found to have used "dummy" codes to pay subcontractor fees from the medical claims fee flow.  *See e.g., Peters v. Aetna, Inc.*, No. 1:15-cv-00109-MR, 2023 U.S. Dist. LEXIS 97526 (W.D.N.C. June 5, 2023) (certifying class where Aetna's subcontractor arrangement allowed for charging a fee greater than allowed by the plan

15

contract and served to hide the excess fees from the plan and members by misidentifying these fees as part of a claim for services).  Although Kraft Heinz's investigation is not complete, it is possible that the missing or undefined codes on these bills were used to generate funds to compensate subcontractors in violation of Aetna's fiduciary obligations.

58.     Kraft Heinz will provide additional detail in an amended complaint.

**C.     Aetna Engages in Post-Adjudication Adjustments Which Harm Kraft Heinz**

**1.     Aetna Engages in Cross-Plan Offsetting**

59.     Dating back to at least 2012, and continuing to today, Aetna engaged in cross-plan offsetting while serving as TPA for Kraft Heinz to the detriment of Kraft Heinz.

60.     Cross-plan offsetting benefits Aetna and its fully insured plans at the expense of self-funded plans, like the Plans.

61.     As an example of a cross-plan offset, Aetna overpays a provider using funds from the Plans.  Rather than collect the overpayment back from the provider, Aetna simply deducts the overpaid amount from the next payment to the provider.  Often, however, the "next" reduced payment (or offset) comes from a different plan such that the reduced amount of the "next" payment does not benefit of the Plans.  Instead, that "next" payment comes from either another self-funded plan or, most frequently, one of Aetna's fully insured plans.  So, another self-funded plan or *Aetna itself,* in the case of a fully insured plan, gets the benefit of the reduced payment amount.

62.     For example, Doctor X treats a patient covered by the Plans.  Doctor X submits a claim for payment to Aetna in the amount of $1,000.  Aetna reviews the claim and pays Doctor X $1,000 for the service.  Aetna later decides that it should have paid Doctor X $600.  Aetna does not ask Doctor X for a refund.  Rather, Aetna waits until Doctor X treats another patient covered by an Aetna fully-insured plan—rather than the Plans.  Doctor X submits a claim for payment to

16

Aetna for $1,000 for treating a second patient.  Aetna reviews the claim and decides Doctor X should be paid $600.  Rather than paying Doctor X $600 for treating the second patient, Aetna deducts the $400 overpayment on the first patient and pays Doctor X $200 for the second patient. Aetna never refunds to the Plans or credits the Plans the $400 that Aetna saved.  Aetna uses cross-plan offsetting to get self-funded plans to subsidize its fully insured book of business.

63.     Aetna benefits from cross-plan offsetting to the detriment of the Plans.  Cross-plan offsetting breaches Aetna's fiduciary obligations to the Plans.  Aetna's practice of cross-plan offsetting has already been held to be unlawful and a violation of ERISA.  *See Lutz Surgical Partners PLLC et al. v. Aetna, Inc. et al.*, No. 3:15-cv-02595 (BRM)(TJB), 2021 WL 2549343, at *15–18 (D.N.J. June 21, 2021) (concluding "Aetna's cross-plan offsetting is prohibited by ERISA"), *vacated* 2023 WL 2472403 (D.N.J. Feb. 8, 2023).

64.     Aetna's continued refusal to produce the underlying financial information needed to link financial transfers to the medical claims continues to inhibit Plaintiffs' ability to assess the extent to which Aetna's practice of cross-plan offsetting has harmed it.

**2.     Aetna Reprocesses Claims to the Detriment of Kraft Heinz**

65.     Aetna takes funds from the Plans in an amount close to the provider-billed amount or the amount the provider is owed pursuant to an in-network agreement.  Aetna frequently reprocesses the claims.  It does this for one reason: to adjudicate the claims at an amount lower than the amount taken from the Plans.

66.     As a result of the reprocessing, Aetna uses the lower reprocessed amount to justify paying the provider less than the billed amount or the amount Aetna otherwise would be contractually required to pay the provider.

67.     Aetna is able to obtain negotiating leverage over the provider because reprocessing the claim, whether justified or not, results in substantial delay of any payments to the provider.

17

68.     It is not uncommon for Aetna to "reprocess" claims multiple times.  As part of its reprocessing, Aetna frequently alters the claim number so that the claim cannot be tracked accurately or traced as required by the applicable regulations.  For example, Aetna's convention is to process (and reprocess) claims electronically.  Such processed and reprocessed claims have an "E" prefix or leading character.  If Aetna is not able to extract the agreement or concession from the provider to take a reduced rate for the claim, then Aetna replaces the "E" prefix or leading character of the claim identification number with a "P"—presumably for "paper"—and reprocesses the claim as a "paper" claim.  This practice disconnects the original electronic claim from the "paper" claim and interferes with the tracing or audit trail associated with the original claim.  Eventually, either Aetna does not pay the reprocessed claim or they pay the reprocessed claim at a significantly reduced rate.

69.     Aetna never refunds, credits, or reconciles with the Plans the difference between any amount taken from the Plans and the amount ultimately paid to the provider pursuant to the reprocessed claims.

70.     Aetna's retention of that difference violates its obligations as a fiduciary under ERISA.

### 3.     Aetna Takes More from the Plans Than It Pays Out-of-Network Providers

71.     For years, Aetna has obtained undisclosed fees from the Plans under false pretenses.  When Aetna receives a claim from an out-of-network provider, it frequently engages a "repricing" company or companies to negotiate a lower amount that Aetna actually pays the providers.  Aetna uses Zelis Healthcare Corp., MultiPlan Corp., and Global Claims Services.  On information and belief, Global Claims Services is a division of Aetna, is owned by Aetna, has common ownership

with Aetna, or is affiliated with Aetna more closely than through an arms-length contractual arrangement.

72.     The providers want to be paid—and should be paid—for treating Kraft Heinz employees, retirees, and their families.  Aetna wants to pay the providers as little as possible.  The repricing companies have one job: to delay payment until the provider's biller relents and agrees to accept an amount well below the billed amount and well below what Aetna wrongfully obtained from the Plans.  If one repricing company is not making headway with a provider, then Aetna shifts the claim to another repricing company, and then another, and then another.  Aetna has not disclosed to Kraft Heinz that the repricing companies are subcontractors or that they are engaged in the claim adjudication and provider payment process.

73.     Aetna's use of repricing companies confirms its practice of taking more from the Plans than it pays providers.  Aetna's agreements with the repricing companies requires it to pay them a percentage of the amount they "save," *i.e.*, a bounty.  Aetna pays the repricing companies from the excess funds it wrongfully obtains from the Plans.  Aetna does not pay the repricing companies their "bounty" from the per-member per-month fee Kraft Heinz pays to Aetna.  Rather, Aetna extracts the "fee" for the repricing companies from the amounts it seeks and obtains from Kraft Heinz to pay provider medical claims.

74.     Management and representatives of the repricing companies are aware that Aetna acts as the Plans' TPA.  Management and representatives of the repricing companies are aware that Aetna pays its "bounty" or "success fee" from an Aetna account or accounts containing funds from the Plans.  Management and representatives of the repricing companies are aware that Aetna obtains money from the Plans before it knows how much a provider will ultimately be paid.

Management and representatives of the repricing companies are aware that Aetna does not refund, credit, or offset to the Plans amounts that the repricing companies save.

### D.     In Direct Violation of ERISA, Aetna Commingles Plan Funds with Its Own Funds

75.     For many of these schemes to work, Aetna moves funds from the Plans' accounts into Aetna's own account containing Aetna's funds and the funds of other plans.  Because Aetna is an ERISA fiduciary, such commingling is not permitted.

76.     As a TPA and an ERISA fiduciary, Aetna is supposed to make payments to providers directly from an account owned and controlled by the Plans.  Aetna is supposed to write checks from or make ACH transfers from the Plans' account to a doctor or hospital who cared for a beneficiary of one of the Plans.

77.     In practice, that is not what happens.  Aetna directs the Plans to fund their accounts in certain bulk and undifferentiated amounts.  Aetna transfers funds from the Plans' accounts not to providers, but to an account or accounts owned and controlled by Aetna or one of its affiliates. Aetna makes payments to providers from the Aetna account or accounts.  The Plans have no access to these accounts, so they do not know how much the providers receive for specific claims and whether that matches the amounts the Plans transferred to Aetna for those specific claims.

78.     Aetna's continued refusal to produce the underlying financial information needed to link financial transfers to the medical claims continues to inhibit Plaintiffs' ability to assess the extent to which Aetna is fully compensating providers for the services provided and whether the amount paid is commensurate with what is being drawn from the Plan.

**E.      Aetna Applies Less Rigorous Claims Adjudication Standards to Self-Funded Plan Claims Than It Applies When Adjudicating Claims for Its Fully Funded Plans**

79.     As an ERISA fiduciary, Aetna is required to treat claims submitted to the Plans like it treats claims submitted to its fully insured plans.  Aetna does not do this.  On information and belief, Aetna applies rigorous standards for accepting, processing, and paying claims submitted to its fully insured plans where Aetna is paying claims with its own money.  As a result of applying these rigorous standards, Aetna has a high rejection rate for claims submitted to its fully funded plans for payment.

80.     Aetna proudly claims in fraud resources available online that it takes a "zero-tolerance approach to fraud."  Aetna even has an entire section of its website dedicated to "Fraud and Abuse."  According to Aetna, estimated financial losses caused by insurance fraud "run in the tens of billions of dollars each year."[2]

81.     Aetna claims to "lead the fight against fraud" through its "Special Investigations Unit," which is dedicated to "aggressively investigating all types of fraud using the latest detection, investigation and recovery techniques."  Aetna claims that "[w]hether taking on large health care management companies or individual providers, we work to protect you."  According to Aetna, its Special Investigations Unit "saves and recovers hundreds of millions of dollars related to fraud, waste, and abuse."  Aetna states that customers can "count on us to fight for you and everyone affected by fraud, day in, day out." *Id.*

82.     Aetna asserts that "reliable fraud detection relies heavily on technology" and its Special Investigations Unit "goes a step beyond with dedicated IT staff and [its] own systems

---

[2]      https://www.aetnafeds.com/pdf/FraudBrochure.pdf.

capability" in order to "gather a huge volume of claims data all in one spot." This way, Aetna claims, it can "use advanced software to comb through massive amounts of data" then "identify providers whose claims appear unusual or inconsistent with their peers.'" *Id.*

83.    Examples of "red flags" Aetna claims it investigates to catch provider fraud include: "unusual provider billing practices;" "billing patterns that are inconsistent with those of peers;" "discrepancies between billed services and patient records;" "unusually high volume or percentage of same services;" "pressure to pay claims quickly;" and "provider advertisements for 'free' services or other incentives." *Id.* As explained in detail above, those are the exact type of claims for which Aetna has approved payment.

84.    But, when Aetna is not responsible for paying claims with its own money, and instead pays claims with money from self-funded plans, like the Plans, Aetna applies far less rigorous standards for accepting, processing, and paying claims submitted for payment. On information and belief, as a result, the claim rejection rate for self-funded plans generally, and the Plans specifically, is lower than the rate for Aetna's fully insured plans.

85.    As a fiduciary, Aetna must devote equal resources of these departments to claims submitted to fully insured plans and self-funded plans. It cannot prioritize its own interests to the detriment of those for whom it acts as a fiduciary. Yet, on information and belief the bulk of Aetna's overpayment, subrogation, coordination of benefits, and fraud, waste, and abuse efforts are devoted to claims submitted to Aetna's fully insured plans.

86.    By prioritizing its own assets and resources to the detriment of the Plans, Aetna has breached and continues to breach its fiduciary duty to the Plans. Aetna has committed to recover overpayments; to make recoveries for subrogation and coordination of benefits; and to police

fraud, waste, and abuse for the benefit of the Plans.  Upon information and belief, Aetna even has specific departments devoted to these activities.

87.     Aetna did not apply the above-described fraud prevention investigations, techniques, and technology to identify and prevent the payment of fraudulent or otherwise improper claims made to the Plans, or did not apply those fraud prevention investigations, techniques, and technology as stringently as they did with claims made to Aetna's own insurance plans.

88.     Aetna's failure to employ these fraud prevention investigations, techniques, and technology adequately, or do so as stringently as it does with claims made to its own insurance programs, violates both its fiduciary duty to "process and pay the claims for Plan benefits incurred on or after the Effective Date using Aetna's normal claim determination, payment and audit procedures and applicable cost control standards."  2015 Agreement at 16.

**F.     Aetna Uses Exclusion Lists as a Means to Limit the Scrutiny Applied to Kraft Heinz's Claims**

89.     On information and belief, Aetna employs a tactic, strategy, or procedure that involves "exclusion lists."  To induce providers to join Aetna's network of providers and enter into "in-network" agreements, and perhaps for other reasons, Aetna agrees to place providers on "exclusion lists."  A provider on this list benefits because being on this list commits Aetna to providing no scrutiny or limited scrutiny of the claims the providers submit for reimbursement. Or, it commits Aetna to scrutinize and properly adjudicate only a small number or a small percentage of the claims submitted for adjudication.

90.     On information and belief, discovery will show that Aetna uses exclusion lists and consequently applied limited scrutiny to certain claims for which Kraft Heinz ultimately paid.

91.     At no point did Aetna disclose the use of exclusion lists to Kraft Heinz.  Nor did it disclose that claims for payment submitted to Aetna related to the case and treatment of Kraft Heinz employees would not be reviewed or scrutinized.

**G.     Aetna Actively Conceals Its Misconduct and Prevents Kraft Heinz from Discerning Whether Aetna Correctly Processed Medical Claims Submitted to the Plans**

92.     Aetna has taken and continues to take affirmative and intentional steps to conceal its misconduct and to prevent Kraft Heinz from obtaining actual knowledge of Aetna's misconduct.

93.     The 2011 and 2015 Agreements between Aetna and Kraft Heinz require that, "[u]pon reasonable prior written request, . . . the Plan-related benefit payment information contained in the Documentation shall be made available" to Kraft Heinz.  2015 Agreement at 7; *see* 2011 Agreement at 14.  Aetna agreed to provide Kraft Heinz with "all documents, records, reports, and data, including data recorded in Aetna's data processing systems."  2015 Agreement at 7; *see* 2011 Agreement at 14.  Aetna has repeatedly refused to provide basic standard transaction medical claims data or data sufficient to allow Kraft Heinz to determine whether the amounts Aetna obtained from Kraft Heinz to pay medical claims were actual paid to the providers.

94.     On September 22, 2021, Kraft Heinz's Senior Counsel, Litigation, sent a letter to Thomas Moriarty, Executive Vice-President, Chief Policy and External Affairs Office, and General Counsel for CVS Health Corporation regarding Kraft Heinz's investigation into Aetna's claims administration.  Aetna is a wholly owned subsidiary of CVS Health Corporation.  On September 28, 2021, Hillary Dudley, Senior Legal Counsel at Aetna responded to Kraft Heinz and invited a discussion of the letter.  On or about October 12, 2021, Kraft Heinz's Senior Counsel, Litigation wrote to Ms. Dudley requesting from Aetna Kraft Heinz standard transaction data sets and related information.

95.     Seven weeks later, Ms. Dudley responded that she was "not familiar with the items requested in your letter."  It is implausible that Aetna's senior counsel does not know about the regulatory required standard transactions, the backbone on which Aetna's core business runs.

96.     In addition, the Agreements with the Plans contain limited "audit" provisions that prevent the Plans from assessing Aetna's practices and from understanding how the Plans' money was actually spent.  For example, in the 2015 Agreement:

a.      Aetna presses the Plans to limit its audit sample to 250 claims.  On average, Aetna processes more than 100,000 medical claims annually for the Plans such that the Plans can audit no more than 0.25% of processed claims.

b.      The audit must be at Aetna's location.

c.      Aetna can veto any auditor chosen by the Plans.

d.      The Plans have to identify for Aetna the claims to be audited four weeks before starting the audit.

e.      Aetna has to agree how the claims to be audited were selected.

f.      Aetna has the right to see the draft audit report and meet with the auditors before any draft goes to the Plans.

g.      The results of any audit cannot be extrapolated across the entire population of claims.

97.     In other words, Aetna's contractual audit provisions deprive the Plans of any visibility into, much less a remedy for, any improperly processed but unaudited claims.  Kraft Heinz had no choice but to accept these terms.

98.     Aetna also prevents Kraft Heinz from learning how much Aetna actually pays providers who submit claims to the Plans.  Knowing how much the providers are actually paid is

an important data point.  It ensures funds from the Plans are being spent properly and consistent with the Plans' requirements.  Nonetheless, Aetna stands in the way of any effort by Kraft Heinz to obtain "[a]ny information with respect to Aetna's or any of its affiliates fees or specific rates of payment to health care providers and any information that may allow determination of such fees or rates and any of the terms or provisions of the health care providers' agreements with Aetna or its affiliates."  2015 Agreement at 7; *see* 2011 Agreement at 39.  Of course, Aetna could agree to permit Kraft Heinz or its representatives to see this information, but Aetna does not.  The Consolidated Appropriations Act of 2021 included a provision that made these "gag" provisions illegal.[3]

99.     Aetna also took additional steps to conceal its misconduct and to interfere with Kraft Heinz's inquiry.  These steps include, but are not limited to:

a.     Kraft Heinz's Manager – Human Resources Compliance has primary responsibility for the Plans' finances. As part of that role, he had access to some information related to Aetna's services through a portal hosted by Aetna.  This included some reports that Aetna generated and various types of financial information relevant to the Plans.  After Aetna learned of Kraft Heinz's inquiry, Aetna disabled Kraft Heinz's access to the Aetna portal. Someone at Aetna finally permitted Kraft Heinz to obtain access to the portal in mid-February 2023.  When Kraft Heinz was able to obtain access

---

[3]     *Consolidated Appropriations Act, 2021 (CAA)*, Ctrs. Medicare & Medicaid Servs., https://www.cms.gov/cciio/programs-and-initiatives/other-insurance-protections/caa   ("A   Gag Clause Prohibition Compliance Attestation (GCPCA) is required under section 201 of Title II (Transparency) of Division BB of the CAA.").

to the Aetna portal, many of the reports and records that had been posted there by Aetna had been removed.

b.   Willis Towers Watson is Kraft Heinz's benefit broker.  Willis Towers Watson provides certain benefits-related services to Kraft Heinz.  As part of Willis Towers Watson's services to Kraft Heinz as a benefits consultant, a person at Aetna regularly transmits to Willis Towers Watson Kraft Heinz medical claims data that generally track the fields in the "Medical/Dental File" discussed above.   Kraft Heinz owns this medical claims data.  Kraft Heinz personnel attempted to obtain access to its own data in Willis Towers Watsons' possession and for which Kraft Heinz paid Willis Towers Watson pursuant to various service agreements and work scope exhibits. Apparently someone at Aetna learned of Kraft Heinz's attempts to get its own data and Aetna intervened, invoking some provision of Aetna's agreement with Willis Towers Watson and prohibited Willis Towers Watson from providing Kraft Heinz with Kraft Heinz's own data.  Aetna also prohibited Willis Towers Watson from providing Kraft Heinz with a copy of the agreement between Aetna and Willis Towers Watson that Aetna invoked to prevent Kraft Heinz from obtaining its own medical claims data.

c.   Aetna removes any information from the standard transaction data sets that would permit a provider or a clearinghouse to identify Kraft Heinz as the source of funds used to pay specific claims.  As a result, Kraft Heinz cannot obtain its own, regulatory required standard transaction data from a clearinghouse because the clearinghouse cannot identify a "Kraft Heinz"

27

835 from any other 835 the clearinghouse may have received from Aetna. Kraft Heinz has attempted to obtain this information directly from various clearinghouses without success due to Aetna's intentional stripping of identifying information from the 835s.

100.    Kraft Heinz possesses additional information and evidence of Aetna's misconduct alleged herein and efforts to prevent Aetna from discovering that misconduct.  That information and evidence, however, may be subject to the protective order entered in another matter.  The use of that information in this matter will be the subject of a motion for entry of a protective order to permit that information and evidence to be used in this matter without risk or exposure.  Kraft Heinz will file that motion promptly after the case is opened.  After that motion is granted and an appropriate protective order entered, then Kraft Heinz will file an amended complaint.

101.    In short, Aetna's practices have deprived Kraft Heinz of any visibility into, much less a remedy for, any improperly processed and unaudited claims.

102.    Aetna's actions were designed to conceal any discovery of its misconduct.

## CLAIM ONE

### Breach of Fiduciary Duty Under ERISA
### (29 U.S.C. §§ 1104(A) AND 1109(A))

103.    Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

104.    Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1104(a), and 1109(a).  Plaintiffs have standing to bring this Claim under these provisions as ERISA fiduciaries.

105.    As the claims administrator to the Plans, Aetna is an ERISA fiduciary and thus owes the Plans, Plan participants, and EBAB a fiduciary duty to discharge its obligations to the Plans "with the care, skill, prudence, and diligence under the circumstances then prevailing that a

prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

106.    Aetna also owed a separate and independent fiduciary duty to discharge its obligations in accordance with the terms of the Plans' documents.  *See* 29 U.S.C. § 1104(a)(1)(D).

107.    Aetna breached its fiduciary duties as set forth herein.

108.    Aetna further breached its fiduciary duties by approving claims for benefits that contained indicia of fraud without first determining (either through an investigation or otherwise) that the claims were legitimate, non-fraudulent and covered by the Plans.

109.    Aetna further breached its fiduciary duty by not recovering from providers amounts paid pursuant to fraudulent or otherwise improper claims.

110.    Aetna's breach of its fiduciary duty resulted in improper payments of fraudulent or otherwise improper claims by Kraft Heinz on behalf of the Plans.

111.    Aetna has made profits of an undetermined amount due to its breach of its fiduciary duties.

112.    Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from Aetna's breach of its fiduciary duty, (ii) the recovery of any and all benefit or profits Aetna made as a result of its breach of its fiduciary duty, (iii) surcharge, (iv) all such other equitable relief as may be appropriate, and (v) the recovery of Plaintiffs' attorneys' fees and costs.

## CLAIM TWO

### Prohibited Transactions Under ERISA
### (29 U.S.C. § 1106(A)(1)(D) AND § 1106(B)(3))

113.    Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

114.     Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1106(a)(1)(D), (b)(3), and 1109(a).  Plaintiffs have standing to bring this Claim under these provisions as ERISA fiduciaries.

115.     Aetna is an ERISA fiduciary.

116.     The health care providers and other parties to whom Aetna made payments pursuant to claims for health benefits that it approved are "parties in interest" under ERISA because they provided or purported to provide "services" to the Plans.

117.     By approving and paying fraudulent or otherwise improper or uncovered claims to such parties in interest, Aetna engaged in "prohibited transactions" by causing the Plans to engage in transactions that Aetna either knew or should have known constitute a direct or indirect transfer to or use by or for the benefit of a party in interest of assets of the Plans.

118.     Neither the Plans nor Kraft Heinz received adequate consideration for the amounts that were paid for these prohibited transactions.

119.     In addition, Aetna retained for itself and transferred to itself monies from the Plans to which it had no lawful right.  Aetna further transferred some portion of Plans' money wrongfully retained or obtained to its affiliates, to its subcontractors, and to other third parties as compensation for their participation in the scheme, pattern and practices employed by Aetna to obtain and retain monies from the Plans to which it had no lawful right.

120.     Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from Aetna having engaged in prohibited transactions, (ii) the recovery of any and all benefit or profits Aetna made as a result of having engaged in prohibited transactions, (iii) surcharge, (iv) all such other equitable relief as may be appropriate, and (v) the recovery of Plaintiffs' attorneys' fees and costs.

## CLAIM THREE

### Breach of Fiduciary Duty Under ERISA
### (29 U.S.C. §§ 1106(B)(1) AND 1109(A))

121.    Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

122.    Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1106(b)(1), and 1109(a).  Plaintiffs have standing to bring this Claim under these provisions because they are ERISA fiduciaries.

123.    As claims administrator for the Plans, Aetna is a fiduciary under ERISA, and thus owes fiduciary duties to Kraft Heinz.  ERISA forbids a fiduciary from engaging in self-dealing. *See* 29 U.S.C. 1106(b)(1).

124.    Aetna controlled and continues to control the adjudication, pricing, repricing, reprocessing, and payment of health care provider claims through an adjudication process.

125.    As a fiduciary, Aetna was required, among other things, to discharge its duties solely in the interest of the participants and beneficiaries of the Plans, to preserve the Plans' assets, and to disclose fully its actions and any compensation it was taking for its services.

126.    As set forth herein, Aetna breached its fiduciary duties by engaging in a variety of wrongful acts and practices.

127.    Additionally, Aetna has made profits of an undetermined amount due to its breach of duty of loyalty and care.

128.    Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from Aetna's breach of its fiduciary duty, (ii) the recovery of any and all profits or benefit that Aetna made as a result of its breach of its fiduciary duty, (iii) an injunction preventing Aetna from acting

4882-9178-2765v2

as a fiduciary of any Kraft-Heinz employee benefits plan, (iv) surcharge, (v) all such other equitable relief as may be appropriate, and (vi) the recovery of Plaintiffs' attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court issue a final judgment:

    a.    ordering Defendant to reimburse or pay Plaintiffs for any and all losses resulting from Defendant breaching its fiduciary duties and/or having engaged in prohibited transactions;

    b.    ordering Defendant to disgorge and pay Plaintiffs any and all profits that Defendant made as a result of its breaches of fiduciary duties and/or having engaged in prohibited transactions;

    c.    ordering Defendant to pay monetary relief to Plaintiffs in the form of an equitable surcharge for any and all losses resulting from Defendant's breaches of its fiduciary duties and/or having engaged in prohibited transactions;

    d.    a preliminary injunction compelling Defendant to provide all Plan claims data (subject to appropriate privacy protections);

    e.    granting all such other equitable relief as the Court may deem appropriate; and

    f.    ordering Defendant to pay Plaintiffs their attorneys' fees and costs.

Dated: June 30, 2023

/s/ Samuel F. Baxter
SAMUEL F. BAXTER
sbaxter@mckoolsmith.com
Texas State Bar No. 01938000
JENNIFER L. TRUELOVE
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com
MCKOOL SMITH P.C
104 East Houston, Suite 300
Marshall, Texas 75670
(903) 923-9000
Fax: (903) 923-9099

Jon Corey
(*pro hac vice* to be filed)
California State Bar No. 185066
jcorey@mckoolsmith.com
MCKOOL SMITH, PC
One California Plaza
300 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

Eric B. Halper
New York State Bar No. 3048360
ehalper@mckoolsmith.com
Radu A. Lelutiu
New York State Bar No. 4252656
rlelutiu@mckoolsmith.com
David I. Schiefelbein
(*pro hac vice* to be filed)
New York State Bar No. 4767398
dschiefelbein@mckoolsmith.com
Emily B. Tate
New York State Bar No. 5769153
etate@mckoolsmith.com
MCKOOL SMITH, PC
One Manhattan West
395 9th Avenue, 50th Floor
New York, NY 10001
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

33

Regan S. Jones
(*pro hac vice* to be filed)
Texas State Bar No. 24110060
rjones@mckoolsmith.com
MCKOOL SMITH, PC
600 Travis Street, Suite 7000
Houston, Texas 77002
Telephone: (713) 485-7300
Facsimile (713) 485-7344

**Attorneys for Plaintiffs The Kraft Heinz Company Employee Benefits Administration Board, Kraft Heinz Company Group Benefits Plan, and Kraft Heinz Company Retiree Group Benefits Plan**

34